

**SIGNED this 11 day of March, 2011.**

_____
**Shelley D. Rucker**
**UNITED STATES BANKRUPTCY JUDGE**

_____


UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION


In re:                                                            No. 09-17172
                                                                  Chapter 7 Debtor
MICHAEL LEON MORGAN,

    Debtor;


RICHARD P. JAHN, JR., TRUSTEE,

    Plaintiffs,

v                                                                 Adversary Proceeding
                                                                  No. 10-1332

MICHAEL LEON MORGAN,

    Defendant.


**Memorandum**

Plaintiff Trustee Richard P. Jahn ("Plaintiff" or "Trustee") has filed this action against the

Defendant Michael Leon Morgan alleging that more than $60,000 in credit card debt is non-

dischargeable debt pursuant to 11 U.S.C. § 727(a)(3) due to the Defendant's failure to keep or preserve records from which his financial condition or business transactions could be ascertained. The Trustee asserts that the Defendant's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3).

The Defendant generally denies that the Trustee has met his burden of proof on his claim pursuant to 11 U.S.C. §§ 727(a)(3) based on the facts stipulated by the parties and the documents submitted into the court record. The parties have requested that, in lieu of a trial in this matter, they provide the court with stipulated facts and exhibits. They have asked the court to issue its opinion and conclusions of law based on the stipulated facts and exhibits.

## I.     Background Facts

The record indicates that the Defendant filed a Chapter 7 Bankruptcy petition on November 4, 2009. [Bankruptcy Case 1:09-bk-17172, Doc. No. 1]. The parties agree to the following relevant facts in this matter as set forth in the Stipulations of Fact:

1. The Debtor, Michael Morgan, filed his Chapter 7 petition on November 4, 2009.

2. Prior to the petition date, he was employed at AIG Insurance as a salesman. He sold personal life insurance policies to individuals in North Georgia.

3. In the normal course of his employment, he would travel to the homes of the insureds and collect premiums each month for AIG. He would deposit the premiums collected directly into AIG's bank account himself.

4. Debtor routinely made his premium payment entries directly to AIG's computer. AIG kept records of the deposits and payments on the individual policies, but the Debtor did not keep these records.

5. Prior to the petition date, a number of the Debtor's insureds were having financial difficulties and could not pay their monthly premiums.

6. At that time, the Debtor decided to use his own credit cards to pay his customers' premiums. The Debtor would take cash advances on his credit cards and deposit the cash into the AIG account for the non-paying insureds.

7. The Debtor did not disclose to his customers or AIG that he was paying the premiums for them.

8. In all, the Debtor used nine credit cards and spent nearly all their prepetition balances, less accruing service charges in paying AIG for his insureds. He listed debts owed to credit card companies of $61,170.00 as of the petition date.

9. Nearly all of the charges on the Debtor's credit cards owed at the time of the petition were due to his taking cash advances and paying premiums to AIG for the benefit of his policyholders.

10. The Debtor's credit card creditors filed claims of $64,559.84, comprising 97% of the total unsecured claims filed.

11. The Debtor did not keep any records showing the amounts and dates of payments that he made on behalf of any of his policyholders.

12. AIG does not maintain records of payments to policyholders for more than one year.

13. The Debtor has furnished the Trustee with a long customer list of policyholders, but the list does not show which of them got their premiums paid by the Debtor, or in what amounts.

14. The Debtor's credit card records were partially furnished to the Trustee. These do not show how or to [sic] whom the Debtor spent his cash advances.

[Doc. No. 21, Stipulation of Facts ("Stipulation")].

The records provided by the parties reveal the following facts. On Schedule B of his Bankruptcy Petition filed with this court on November 5, 2009, the Defendant listed that he possessed $20 in cash, $100 in a checking or savings account, $300 in books, pictures or other collectibles, and $300 in clothing. [Doc. No. 22-1, p. 8]. He also listed that he owned a 2000 Mercury Sable worth $2,500. *Id.* at p. 10. On his Schedule D form, the Defendant listed no creditors holding secured claims against him. *Id.* at p. 12. On Schedule F the Defendant listed nine different creditors holding unsecured claims against him. *Id.* at pp. 15-16. These creditors include: American Express (claim of $3,300), Bank of America (claim of $16,400), Chase Bank (claim of $27,100), Citibank S. Dakota (claim of $1,400), Citizens Bank (claim of $7,800), FIA Card Services (claim of $4,800), Capital One Bank USA (claim of $370), Citizens Auto Finance (claim of $800), and Sallie Mae (claim of $2,240). *Id.* The total amount of unsecured debt the Defendant indicated he owed these creditors is $64,210. *Id.* On Schedules I and J the

Defendant listed average monthly income of $919.02 and average monthly expenses of $2,502.00. *Id.* at pp. 19-20. His Summary of Schedules indicates total assets of $3,220, total liabilities of $64,210, monthly income of $919.02, and monthly expenses of $2,502. *Id.* The Defendant's Statement of Financial Affairs indicates that FIA Card Services filed a civil action against the Defendant to garnish his wages. *Id.* at p. 26.

On the Defendant's Statement of Current Monthly Income and Means-Test Calculation, the Defendant indicated that he had gross business receipts of $3,350.05 and ordinary and necessary business expenses of $2,175.46 for a net business income of $1,174.79. [Doc. No. 22-1, p. 36].

On January 28, 2010 the Defendant filed an Amendment to his Schedule A indicating that he owned his home at 172 Detha Lane in Ringgold, Georgia in a joint survivorship with his wife. He indicated that the value of his interest in the property was $35,000. [Doc. No. 22-2, p. 1]. He also amended his Schedule B to indicate that he owned a part of a joint credit union account with his wife that had a balance of $11,130 and a checking account with a balance of $2,300. *Id.* at p. 2. He also indicated that he possessed household goods worth $500 and clothing worth $300, as well as the Mercury Sable worth $1,850. *Id.* at pp. 2-4. The Defendant further amended his Schedule I to indicate that his wife had a monthly net income of $3,600. *Id.* at p. 6.

The Claims Register in the underlying bankruptcy matter lists the following creditors with claims in the amount listed beside each name:

| Creditor | Amount |
|---|---|
| Citibank | $ 1,815.24 |
| Chase Bank USA | $12,121.15 |
| Chase Bank USA | $18,865.67 |
| American Express | $ 4,076.96 |
| Sallie Mae | $ 1,819.36 |

| | |
|---|---|
| FIA Card Services, NA Bank of America | $ 9,993.84 |
| FIA Card Services, NA Bank of America | $ 4,748.15 |
| FIA Card Services, NA Bank of America | $ 4,137.96 |
| FIA Card Services, NA Bank of America | $   275.71 |
| RBS Citizens | $ 8,525.16 |

[Doc. No. 22-3, Claims Register].

The record also includes a twenty-three page list of the Defendant's customers at AIG that includes each individual's name and address. [Doc. No. 22-4]. This listing does not contain any information regarding insurance policies, amounts of premiums, amounts paid, or amounts contributed by the Defendant.

In response to the Trustee's request for production of documents, the Defendant provided the Trustee with some credit card statements from some of the creditors who filed unsecured claims in the Claims Register in the underlying bankruptcy case. The credit card records include statements from two Chase Bank credit cards, one American Express credit card, and one Citizens Bank credit card. The first Chase credit card account statements span from October 28, 2007 to October 27, 2008 with the statements from June, July, and August of 2008 missing. The opening balance on the account was $16,078, and the balance in October of 2008 was $18,865.67. The increase in the balance appears to be due to a combination of finance charges and late fees. It does not appear from the records that the Defendant made large cash withdrawals from this account during the time period reflected in the statements provided. *See* [Doc. No. 24, pp. 1-9].

The second Chase credit card account statements span from October 22, 2007 to October 21, 2008. The opening balance in October of 2007 was $11,513.66, and the closing balance in October of 2008 was $11,806.68. In March and April of 2008, the Defendant used this Chase credit card to pay down balances on other credit cards, such as cards issued by

American Express, Bank of America, Citicards, and Citizens Bank. In April of 2008, the Defendant also made two purchases at Favorite Market convenient stores, which may have been cash withdrawals within the store. Most of the other charges appear to be late fees accrued and payment protector plan charges. *See* [Doc. No. 24, pp. 10-21].

The American Express statements span from December 20, 2007 to July 21, 2008. The balance in December of 2007 was $4,274.22 and the balance in July of 2008 was $3,434.93. The account was over its limit and past due in July of 2008. [Doc. No. 24, pp. 23-31].

The Citizens Bank credit card statements span from December 10, 2007 to December 9, 2009. The opening balance in December of 2007 was $5,891.19, and the closing balance in December of 2009 was $8,835.54. In December of 2007 and early 2008, the Defendant withdrew cash in several separate withdrawals. Each withdrawal was in small denominations such as $100, $160, or $200. In December of 2008 and January of 2009, the Defendant withdrew some cash in amounts of $100 and $200 for a total of $500. [Doc. No. 24, pp. 32-47].

It is possible that some of the cash withdrawals from the Citizens Bank credit card account were withdrawals to pay the insurance premiums of certain AIG customers. However, there is no way, based on the record provided, for the court to determine how the funds were distributed, the amount paid, and the individual customer affected. The Defendant has produced records that relate to approximately $42,942.82 of his unsecured credit card debt, calculated as of the last closing date of the most recent credit card statement.

**II.    Jurisdiction**

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district provide this court with jurisdiction to hear and decide this adversary proceeding. The Plaintiffs' action regarding the dischargeability of particular debts is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(J).

**III.    Analysis**

**A.    Non-Dischargeability Pursuant to 11 U.S.C. § 727(a)(3)**

11 U.S.C. § 727(a)(3) provides:

(a)  The court shall grant the debtor a discharge unless – . . .(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

Although exceptions to discharge are narrowly construed in the debtor's favor, "'[b]road discretion is vested in the referee to grant or deny a bankruptcy petition based on a determination that books or records are adequate under the terms of the statute and the facts of each case . . . .'" *In re Dolin*, 799 F.2d 251, 253 (6th Cir. 1986) (quoting *McBee v. Sliman*, 512 F.2d 504, 506 (5th Cir. 1975)); *see also Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004); *CM Temporary Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007)("statute is to be liberally construed in favor of the Debtor").

Courts in this Circuit have interpreted 11 U.S.C. § 727(a)(3) "to apply a shifting burden of proof":

The Plaintiff must establish a *prima facie* case showing the Debtor failed to keep adequate records. For purposes of § 727(a)(3), the Plaintiff is not entitled to perfect, or even necessarily complete, records. Instead, the Debtor must provide the Plaintiff "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." In determining the adequacy of records, the court can consider the Debtor's education, business experience, sophistication, or any other relevant factor.

If the Plaintiff has established this *prima facie* case, the burden then shifts to the Debtor to explain why the failure to keep records, under the circumstances of the case, is justified. In considering an explanation, the court should consider both the Debtor's credibility and the reasonableness of the explanation, considering the debtor's sophistication and the materiality of the records. The requirement for keeping recorded information is not an unqualified one and complete disclosure is not always required, but instead it is a question of

Page 7

> reasonableness under the circumstances. However, if disclosure cannot be made without the keeping of recorded information, the failure to supply the records is relevant to the policy underlying § 727(a)(3).
>
> The ultimate burden of persuasion, of course, rests with the Plaintiff. The standard of proof for discharge objections under § 727(a) is by a preponderance of the evidence.

*CM Temporary Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415-16 (Bankr. S.D. Ohio 2007) (quoting *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (B.A.P. 6th Cir. 1999)) (other citations omitted). In addition, "'[t]he adequacy of debtor's records must be determined on a case by case basis. Considerations to make this determination include debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice." *In re Strbac*, 235 B.R. at 882 (quoting *United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990)). Further, "intent is not an element under § 727(a)(3)." *See Hendon v. Lufkin (In re Lufkin)*, 393 B.R. 585, 593 (Bankr. E.D. Tenn. 2008).

A bankruptcy judge maintains broad discretion to deny a discharge based on inadequate books and records. *See In re Lufkin*, 393 B.R. at 593. Courts may review certain factors when determining whether to deny a discharge to a particular debtor pursuant to 11 U.S.C. § 727(a)(3):

> (1) whether the debtor was engaged in business, and if so, the complexity and volume of the business; (2) the amount of the debtor's obligations; (3) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; (4) the debtor's education, business experience and sophistication; (5) the customary business practices for record keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part; and (8) the debtor's courtroom demeanor.

*Id.* (quoting *Pereira v. Kowalski (In re Kowalski)*, 316 B.R. 596, 602 (Bankr. E.D.N.Y. 2004)). Courts will consider the individual facts of the situation in determining whether to deny a discharge for failure to maintain records, including the relative business experience of the

debtor. For example, in *In re Sutton* the bankruptcy court declined to deny a discharge to the debtor, noting:

> The evidence presented in the present case establishes that the debtor had kept records of his business transactions and that those records were made available to [the creditor]. [The creditor] failed to prove that the debtor withheld or destroyed any of its business records. While the records maintained by the debtor may not have been a paragon of clarity, this court notes that the debtor was self-employed and had very little formal education, facts known to the creditor from the beginning of the relationship with the debtor.

*Energy Marketing Corp. v. Sutton (In re Sutton)*, 39 B.R. 390, 398 (Bankr. M.D. Tenn. 1984). *See also In re Devaul*, 318 B.R. 824, 838 (Bankr. N.D. Ohio 2004). Bankruptcy courts in this circuit have created a standard for assessing the adequacy of recordkeeping that recommends that "the Debtor's records should be measured 'against the type of books and records kept by a reasonably prudent debtor with the same occupation, financial structure, education, and experience.'" *Ayers v. Babb (In re Babb)*, 358 B.R. 343, 354 (Bankr. E.D. Tenn. 2006) (quoting *Wazete v. Michigan Nat'l Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997) (internal quotation omitted)).

In *Ochs v. Nemes (In re Nemes)* the bankruptcy court confronted a situation of missing credit card records similar to the situation faced by this court. 323 B.R. 316 (Bankr. E.D.N.Y. 2005). There, the trustee brought an action pursuant to § 727(a)(3) due to the debtor's failure to keep adequate credit card records relating to $114,754.94 of unsecured debt. *Id.* at 320-21. The debtor's unsecured debt had accumulated through his use of twelve credit cards and two lines of credit. *Id.* The debtor, a youth worker and teacher, contended that he spent the majority of the funds on basic living expenses for himself and his family. *Id.* at 321.

In reviewing the nature of the records produced by the debtor, the court in *In re Nemes* noted:

> Credit card records and bank statements are among the kinds of documents that give rise to challenges to a debtor's discharge under 727(a)(3). "While bank statements and credit card receipts or monthly statements may be simple

>   records, they 'form the core' of what [is necessary] to ascertain [the Debtor's]
>   financial condition, primarily his use of cash assets."

323 B.R. at 325 (quoting *The Cadle Co. v. Terrell*, No. 4:01-CV-0399-E, 2002 WL 22075, at *5 (N.D. Tex. Jan. 7, 2002)).  After analyzing the records produced by the debtor, the court concluded that "[i]n sum, the record shows that the Debtor produced incomplete credit card records for the two years preceding the Petition Date for approximately $82,896, or more than two thirds, of his scheduled unsecured debt, incurred through the use of seven credit cards and two credit lines."  *In re Nemes*, 323 B.R. at 326.

In finding that his failure to keep adequate records relating to his unsecured debt was not justified, the court quoted the bankruptcy court in *In re Sethi* regarding the maintenance of adequate records:

>   Debtors have a duty to preserve those records that others in like circumstances
>   would ordinarily keep.  Hence, the debtor's honest belief that he does not need to
>   keep the records in question, or that his records are sufficient, or his statement
>   that it is not his practice to keep additional records, does not constitute
>   justification for failure to keep or preserve records under § 727(a)(3).  "If the
>   debtor's transactions were such that others in like circumstances would ordinarily
>   keep financial records, then [the debtor] must show more than that [he] did not
>   comprehend the need for them and must carry [his] explanation by way of
>   justification to the point where it appears that because of unusual circumstances
>   [he] was under no duty to keep them."

*Id.* at 329 (quoting *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 839 (Bankr. E.D.N.Y. 2000) (internal quotation omitted)).  The court rejected the debtor's purported justifications that he lacked education, had a low income, and did not plan to file bankruptcy and granted the trustee's motion for summary judgment regarding his § 727(a)(3) claim.

In this action the Trustee contends that he needed more accurate records of the Defendant's spending to determine whether to bring fraudulent transfer claims pursuant to 11 U.S.C. § 548 against AIG or the insureds.  The Defendant responds that the facts of this case do not fit the definition of fraudulent transfer.  The Defendant claims that his transfer of insurance premiums to AIG is not voidable because AIG took the premiums "in good faith and

for a reasonably equivalent value." The Defendant paid the premiums of the insureds, and AIG provided those insureds with insurance coverage for the policy period. Thus, Defendant argues, AIG earned the premiums it received through its provision of insurance. The Defendant maintains that neither the insureds nor AIG knew that the Defendant was covering the cost of the premiums. Therefore, the Defendant concludes, the Trustee cannot maintain a cause of action against any third party on fraudulent transfer grounds. He further asserts that the cash withdrawals and payments for insureds occurred more than two years before the date of the filing of the petition, and thus would not be voidable under 11 U.S.C. § 548.

The court must apply the burden-shifting analysis to the Stipulation of Facts and the evidence submitted into the record. The Trustee has stated a prima facie case of a violation of § 727(a)(3). Having found the records to be inadequate, the court must assess what justification, if any, the Defendant has supplied for his actions. It is the Defendant's turn to justify why he has no records. The Stipulations do not contain any information on the Defendant's relative sophistication, education, and business experience that would explain his lack of records. The Defendant has offered no reason why he failed to keep any credit card records. He has offered a customer list with over five hundred names, but the list has no record of payments or policies purchased. The Defendant contends that AIG kept records but those are now lost due to age. He offers no evidence that relying solely on the company's records is the standard practice in the industry for agents.

However, the practice standards may not be sufficient in this case where the Defendant operated his business in a very unusual way. If the Defendant is to be believed, he undertook to provide insurance to his customers at no charge to them by paying their premiums. However, he kept this act of kindness secret from them. The court questions the credibility of this explanation since the beneficiaries of this insurance would not have known that they had insurance and so could not make a claim. If he had wanted to help these individuals, he would

have wanted to make sure that they knew they were insured. He might have earned a commission from the sale or been considered for a promotion; but, without knowledge of the premium payment, his customers would have never filed claims on the insurance. If the Defendant did actually engage in this exceptional business practice, it would have become even more important to keep records of these payments, the names of the special customers, and any claims that they might have made for his benefit if there was ever a problem which the insurance would cover. This Defendant has no records of the advances he took to make the "gifts," nor any records of the recipients of the gifts.

Intent is not a factor under § 727(a)(3), so it does not matter that the Defendant now says he intended to maintain adequate records by relying on AIG's records of policy holders. Even if the AIG records were still available, the Defendant would have to be able to identify which customers whose premiums he advanced and which customers paid their own premiums. He has stipulated he cannot do that. In addition, he offers no other explanation as to why he no longer has his credit card statements so that the court could determine how and when these alleged advances for his customers were made.

### IV.    Conclusion

The Trustee has met his burden of proof on his objection to discharge under § 727(a)(3). The Defendant did not keep adequate records and the court does not find the Defendant's justification sufficient in light of his explanation of his unusual business practice of advancing premiums for his customers. The Defendant's discharge will be denied for failure to maintain adequate books and records. A separate order will enter.